IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH

| | | |
|---|---|---|
| PETERS TOWNSHIP SCHOOL DISTRICT, | ) | |
| | ) | |
| Plaintiff, | ) | 2:20-CV-01576-CRE |
| | ) | |
| vs. | ) | |
| | ) | |
| B. B., A MINOR; D. B., HIS PARENT; | ) | |
| AND D. B., HIS PARENT; | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |

## MEMORANDUM OPINION[1]

CYNTHIA REED EDDY, Chief United States Magistrate Judge.

## I.  INTRODUCTION

Plaintiff Peters Township School District (the "District") initiated this civil action against B.B. ("Student") and his parents, D.B. and D.B. (collectively "Parents") seeking reversal of a portion of the Hearing Officer's order in connection with the Student's special education services under the Individuals with Disabilities Education Act.  Defendants filed a counterclaim seeking a reversal of a portion of the Hearing Officer's order with respect to the Hearing Officer's finding related to the Defendants' Rehabilitation Act of 1973 claim.  The Court has jurisdiction under 28 U.S.C. § 1331.

Before the Court for consideration are the parties' cross motions for summary judgment. ECF Nos. 33 & 37.  The motions are fully briefed and ripe for consideration. ECF Nos. 34, 38, 40, 41, 42, 43.  For the reasons that follow, the District's motion for summary judgment ECF No. 33

---

[1]     All parties have consented to jurisdiction before a United States Magistrate Judge; therefore the Court has the authority to decide dispositive motions, and to eventually enter final judgment. *See* 28 U.S.C. § 636, *et seq*.

is granted and Defendants' motion for summary judgment ECF No. 37 is denied.

## II.    BACKGROUND

### a.  The Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA")

The IDEA was enacted to "ensure that all children with disabilities have available to them a free appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs." *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 271 (3d Cir. 2014) (quoting 20 U.S.C. § 1400(d)(1)(A) (internal quotation marks omitted)). The IDEA makes federal funding contingent upon compliance with several requirements, "all aimed at protecting the rights of students with disabilities and their parents.  The main requirement is that states make available a FAPE to children with disabilities." *Id.* (citing 20 U.S.C. § 1412(a)(1)).  In so doing,

> [s]tates must comply with detailed procedures for identifying, evaluating, and making placements for students with disabilities, as well as procedures for developing IEPs [Individualized Education Program].  They must also implement specified procedural safeguards to ensure children with disabilities and their parents are provided with due process.  These safeguards, known collectively as the IDEA's administrative process, provide parents with an avenue to file a complaint and to participate in an impartial due process hearing with respect to "any matter relating to the identification, evaluation, or educational placement of the[ir] child, or the provision of a free appropriate public education to such child.

*Batchelor*, 759 F.3d at 271–72 (citations omitted) (alteration supplied).

"The IDEA's administrative process is conducted in compliance with state procedures . . . [and in] Pennsylvania, an impartial hearing officer presides over the due process hearing." *Id.* (citations omitted) (alteration supplied).  "Following completion of the IDEA's administrative process, i.e., exhaustion, the IDEA affords '[a]ny party aggrieved by the findings and decisions' made during or pursuant to the impartial due process hearing an opportunity for judicial review." *Id.* (citing 20 U.S.C. § 1415(i)(2)(A) and *Komninos by Komninos v. Upper Saddle River Bd. of*

*Educ.*, 13 F.3d 775, 778 (3d Cir. 1994)). "In the normal case, exhausting the IDEA's administrative process is required in order for the statute to 'grant[ ] subject matter jurisdiction to the district court [ ].' " *Id.* (quoting *Komninos by Komninos*, 13 F.3d at 778).

### b. Factual Background

#### i. *2017-2018: 7th Grade*

During the 2017-2018 school years, the Student attended seventh grade in the District. Following a series of mounting absences in the late fall of 2017, in December 2017, the District sought, and the Parents granted, permission to evaluate the Student. ECF No. 30 at ¶ 1.  For a brief period, the Student dis-enrolled from the District and enrolled in a cyber charter school. *Id.* at ¶ 2. Due to the lack of engagement with the cyber learning environment, the Student re-enrolled at the District. *Id.*  The Student would not come to the District for evaluation, so the District school psychologist went to the Student's home for an evaluation. *Id.* at ¶ 3.  The Student would not come out of his bedroom and therefore the school psychologist was unable to use any assessment instruments as part of the evaluation. *Id.*

In February 2018, the District issued its Evaluation Report ("February 2018 ER"). *Id.* at ¶ 4.  An Evaluation Report is a multidisciplinary evaluation performed by a school psychologist to determine whether a student qualifies for special education and related services. 22 Pa. Code § 14.123.  The February 2018 ER contained various behavioral and emotional assessments from the Parents and teachers, and according to the District its purpose was to investigate Student's truancy and potential mental health concerns as presented by the Parents: anxiety and depression. ECF No. 35 at ¶ 2.  According to the District, the School Psychologist administered the Behavior Assessment System for Children ("BASC-3") to two (2) teachers and a Parent. *Id.* at ¶ 3.  The February 2018 ER noted that the Student had missed school since early December through the date

of the report "due to [the Student's] refusal to leave the family home." ECF No. 30 at ¶ 4.  One teacher who rated the Student's behavior rated the Student at clinically significant levels, among others, for atypicality and developmental social disorders. *Id*. at ¶ 5.  This teacher also rated the Student as at-risk, among others, for social skills, functional communication, and bullying. *Id*.  A second teacher rated the Student at clinically significant levels, among others, for social skills and this teacher also rated the Student as at-risk, among others, for functional communication, bullying, and developmental social disorders. *Id*.  Parents rated the Student at clinically significant levels in no sub-scale and as at-risk for depression and emotional self-control. *Id*.  The February 2018 ER identified the Student with an emotional disturbance and made multiple recommendations for programming in the school environment. *Id*. at ¶ 6.

At the time the February 2018 ER was issued, the Student was referred by an outside agency for admission into a mental health short-term residential hospitalization program for "increasing aggression, isolative behaviors, and emotional and behavioral dysregulation along with school refusal." *Id*. at ¶ 7.  It was reported that the Student was threatening and aggressive at home, while at school, threats and aggression were not behaviors that manifested in the school environment, but defiance was exhibited by the Student in school. *Id*. at ¶ 8.  The Student was provisionally diagnosed with adjustment disorder with anxiety and depression. *Id*. at ¶ 9. According to the District, it contacted the residential program via telephone and was informed by the program that the Student was diagnosed with anxiety, depression and parent-child conflict and neither the program nor the Parents mentioned a diagnosis or concern regarding autism. ECF No. 35 at ¶ 6.  Upon the Student's discharge from the partial hospitalization program, the Student began to receive services from a truancy support program from February 2018 to June 2018. ECF No. 30 at ¶¶ 10-11.  According to the District, the Student was making academic and behavioral progress

but left the hospitalization placement against the advice of staff. ECF No. 35 at ¶ 7. The Student's school attendance marginally improved, but the Student often barricaded the door to the bedroom each morning and would not come out and/or threatened the Parents and/or exhibited aggression with the Parents. ECF No. 30 at ¶ 11.

On March 2, 2018, the multidisciplinary team convened, which included the Parents and found the Student eligible for an Individualized Education Program ("IEP") and the team discussed the information received from the residential program, and according to the District, the Parents confirmed the Student's diagnosis of adjustment disorder with mixed anxiety and depression. ECF No. 35 at ¶ 8. An IEP describes the types of services and support a student will receive. 22 Pa. Code § 14.131.

In March 2018, the Student's IEP team met, and the Student was present at the meeting but would not substantively interact with participants. ECF No. 30 at ¶ 12. The March 2018 IEP recognized the need for the Student to improve school attendance, to develop coping skills, and for support for work-completion. *Id*. at ¶ 13. The March 2018 IEP contained three goals to address coping skills and work completion and recognized the need for a functional behavior assessment. *Id*. at ¶¶ 13-14. According to the District, the District referred the Student to an intensive truancy prevention program that observed and worked with Student in the home and reported information back to the District. ECF No. 35 at ¶ 9. In late-March 2018, the District and the family, including the Student, collaboratively developed a school-attendance improvement plan and in April 2018, the Student's attendance at school improved. ECF No. 30 at ¶¶ 15-16.

In April 2018, a Functional Behavior Assessment ("FBA") was performed and the members of the IEP team, including the Student, met to discuss the FBA. *Id*. at ¶ 17. An FBA is a behavioral evaluation used to determine the antecedent basis, behavior, and consequence of a

particular school behavior.  An FBA often informs a student's behavioral supports at school. 22 Pa. Code § 14.133.  According to the District, the FBA was focused on the Student's in-school behaviors, primarily refusing to attend school, attend classes, to complete tasks by challenging "why?" or by passively disengaging, most frequently in science class when presented with a task that involves writing or typing. ECF No. 35 at ¶ 11.  The April 2018 meeting also included the discussion of the potential need for summer school programming to allow for the Student to maintain earning credit for promotion to the eighth grade. ECF No. 30 at ¶ 18.  According to Defendants, the FBA was void of any observations of the Student's avoidance behaviors. ECF No. 36 at ¶ 9.

In May 2018, the Student's IEP team met to discuss a Re-evaluation Report ("RR") that included the results of the FBA, including additional observations. ECF No. 30 at ¶ 19. Additionally, the Student's IEP team, including the Student, met to revise the Student's IEP in light of the April 2018 FBA and the May 2018 RR. *Id*. at ¶ 20.  The May 2018 IEP continued to recognize the need for the Student to improve school attendance, to develop coping skills, and for support for work-completion and continued goals in those areas. *Id*. at ¶ 21.  The May 2018 IEP also included results from the April 2018 FBA and May 2018 RR as the background for a positive behavior support plan ("PBSP"). *Id*. at ¶ 22.

In the 2018-19 school year, the Student failed science, social studies, and language arts. *Id*. at ¶ 23.  From January through June 2018, the Student was absent without excuse 37 times and tardy for school 19 times. *Id*. at ¶ 24.  According to Defendants, during the entire 2017-2018 school year, the Student was absent 77 days of school and tardy 91 times. ECF No. 36 at ¶ 10.  The Student's attendance showed slight improvement, though with extensive tardies, in March and May, and marked improvement across all fronts in April. ECF No. 30 at ¶ 24.

In late June 2018, following a private evaluation that was privately arranged by the Parents, the Defendants received a neuropsychological report ("June 2018 Neuropsych Evaluation"). *Id*. at ¶ 25.  In the Neuropsych Evaluation, the Parents and Student reported that the Student does not like changes to routine or environment, has experienced peer difficulty, and over time has preferred to be alone, especially in the bedroom which the Parents described as the Student's "sanctuary." *Id*. at ¶ 26.  The Parents differed on whether the Student effectively picks up social cues, and parental input indicated that the Student has certain sensory behaviors related to clothing and food and wasting when things are not "perfect." *Id*.  The June 2018 Neuropsych Evaluation contained a comprehensive battery of assessment of the Student's cognitive ability, memory and learning abilities, executive functioning, social/emotional/behavioral ratings and assessments, as well as assessments for autism spectrum rating scales. *Id*. at ¶ 27.  The results of the cognitive testing and assessment of memory and learning in the June 2018 Neuropsych Evaluation were new to any understanding of the Student and at this point in the record because the Student did not engage in such assessment in the District evaluation processes.  The results of the social/emotional/behavioral assessments were consistent with the results of similar assessments completed by the Student's teachers, the District's assessments, although the Parents showed slightly elevated levels of at-risk concerns over those rated in the District evaluations. *Id*. at ¶ 28. The results of the autism spectrum assessments showed that "with exception of . . . slightly elevated behavioral rigidity, the remainder of the scales . . . were entirely within normal limits." *Id*. at ¶ 29. The June 2018 Neuropsych Evaluation diagnosed the Student with anxiety disorder, oppositional defiance disorder, and depressive disorder and explicitly ruled out a diagnosis of autism spectrum disorder. *Id.* at ¶ 30.  The June 2018 Neuropsych Evaluation made largely mental-health and home-based recommendation and there were some general recommendations for the school environment,

including continued implementation of the Student's IEP, though any information about the IEP was reported by the Parents and/or Student and no academic records were furnished to the evaluator. *Id*. at ¶ 31.

According to the District, throughout Student's seventh grade year, neither the Student nor Parents raised a concern regarding a potential diagnosis of autism. ECF No. 35 at ¶ 4.

In the summer of 2018, the Student attended a summer school program for credit recovery and promotion to the eighth grade. *Id*. at ¶ 32.

### ii.   *2018-2019: 8th Grade*

The Student returned to the District for the 2018-2019 school year for eighth grade. *Id*. at ¶ 33.  In the first two weeks of school, the Student experienced a handful of absences and multiple tardies and beginning on Friday, September 7, 2018, the Student did not attend school. *Id*. at ¶ 34. In late-September 2018, the Student's treating psychiatrist contacted the District by letter and recommended that due to the Student's "marked school refusal and isolation", that the Student be educated in a partial hospitalization program. *Id*. at ¶ 35.  A partial hospitalization program is a program where a student can receive mental health services and educational services during the school day.  It is not a residential program and admission to a partial hospitalization program is generally achieved through a physician's recommendation. ECF No. 35 at ¶ 15 n. 7.

In October 2018, the District recommended the partial hospitalization program.  The Parents agreed, and on October 5, 2018, the Student began to attend a partial hospitalization program affiliated with a nearby school district for its educational component. ECF No. 30 at ¶ 36. In early October 2018, as part of the mental health component for the partial hospitalization program, the Student was evaluated by a psychiatrist with the clinic. *Id*. at ¶ 37.  The evaluator did not administer any assessments, and instead performed a records review and diagnosed the Student

with generalized anxiety disorder, depressive disorder, and autism spectrum disorder. *Id*. at ¶ 38. The psychiatrist shared the results with the Parents, who assumed that the clinic and District were in communication, but the clinic did not share therapeutic information or diagnostic impressions with the District. *Id*. at ¶ 39. The Student was re-evaluated in late October 2018 to update initial data, including grades and teacher input from the hospitalization program resulting in an RR. *Id*. at ¶ 40.

In November 2018, the multidisciplinary team convened to review the RR and develop an IEP. ECF No. 35 at ¶ 18. According to the District, although a representative from the mental health portion of the partial hospitalization program was present, they did not mention a diagnosis of autism spectrum disorder and the District was not aware until November 2019 that the Student had a possible diagnosis of autism spectrum disorder. ECF No. 35 at ¶ 19. In November 2018, the Student's IEP team met to revise the Student's IEP. The November 2018 IEP included three goals, one for skills in assignment completion, and two for school attendance. The IEP included a PBSP. ECF No. 30 at ¶¶ 41-42. In October 2018, the Student had very few absences, all of which were excused. *Id*. at ¶ 43. In November and December 2018, the Student's unexcused absences increased. *Id*. at ¶ 44. In January 2019, the District implemented a school attendance improvement plan and in February and March 2019, the Student continued to be absent from school without excuse. *Id*. at ¶¶ 45-46.

In March 2019, the District filed a truancy notice with the local magistrate. *Id*. at ¶ 47. As part of the truancy hearing in April 2019, the school district where the Student was being educated provided an update on the Student's program, indicating that the Student was performing academically well and that attendance was steady, with periods of prolonged attendance. *Id*. at ¶ 48. Over the 2018-19 school year at the partial hospitalization program, the Student missed 44

days of school and was tardy 22 times. *Id*. at ¶ 49.  The Student received passing grades in language arts, mathematics, music and art and failed science. *Id*. at ¶ 50.

In May and early-June 2019, the Student's IEP team, including the Student, met to discuss the Student's programming for the 2019-2020 school year.  The IEP meeting included educators from the partial hospitalization program as well as a representative from the therapeutic component of the program. *Id*. at ¶ 51.  The District formally recommended the partial hospitalization program at the nearby school district and the Parents neither approved nor disapproved the recommendation, and another IEP team meeting was scheduled. *Id*. at ¶ 52.

In mid-June 2019, the District issued an RR ("June 2019 RR") which contained updated behavioral ratings from teachers at the partial hospitalization program.  The teacher's rating contained fewer at-risk and clinically significant ratings.  The first teacher rated the Student as clinically significant in atypicality and at-risk in depression, somatization, withdrawal, adaptability, leadership and study skills.  A second teacher rated the Student as clinically significant in withdrawal and at-risk in adaptability, leadership, and social skills.  A third teacher did not rate the Student as clinically-significant or at-risk in any area. *Id*. at ¶¶ 53-54.  The Parents did not complete behavioral ratings for the June 2019 RR.  The Student and Parents did not participate in testing sessions as they had been scheduled to. *Id*. at ¶ 55.  The June 2019 RR continued to identify the Student with an emotional disturbance. *Id*. at ¶ 56.

Following the June 2019 RR and the May/June IEP meetings, the Student's IEP team revised the Student's IEP. *Id*. at ¶ 57.  The education-based member of the IEP team recommended that the Student continue in the partial hospitalization program, with a view of returning the Student to a District-based program as school attendance improves, but the Parents and Student declined, feeling that the Student should return to District-based placement. ECF No. 35 at ¶ 21.

The education-based members of the IEP team then recommended that the Student receive a half-day program at the partial hospitalization program and a half-day at the School District, but the Parents and Student again declined and sought the Student to return to a District-based placement. *Id*. According to the District, the District and partial hospitalization program observed that if the Student did not get what they[2] wanted, the Student would shut down and stop attending school. *Id*. at ¶ 22.

The IEP team reconvened and based upon improvements shown in the BASC-3 along with improvements from the February 2018 Evaluation Report and the June 2019 Reevaluation Report, the District permitted the Student to attend the District for the ninth grade. ECF No. 35 at ¶¶ 24-25. The June 2019 IEP included three goals, one for work-completion, one for school attendance, and one for engagement in sessions with the social worker. The IEP included a PBSP. ECF No. 30 at ¶ 58. The June 2019 IEP called for placement at the District high school in regular education except for learning support in English and mathematics and social work sessions three times per month. The Student would be included in regular education for 76% of the school day. Id. at ¶ 59. The Parents approved this IEP and recommended educational placement. *Id*. at ¶ 60.

During the 2018-2019 school year, the Student was absent from school 77 days. ECF No. 36 at ¶ 13.

    *iii.   2019-2020: 9th Grade*

The Student returned to the District for the 2019-2020 school year, the Student's ninth grade year. ECF No. 30 at ¶ 61. In August 2019, prior to the beginning of the school year, the Student's IEP team met to revise the Student's IEP, placing the Student in regular education

---

[2]    At times, the Court uses the plural pronouns of they/their/themselves to safeguard the Student's identity and the use of plural pronouns does not connote gender.

settings for English and mathematics and providing for weekly social work sessions. The Student would be included in regular education for 90% of the school day. *Id*. at ¶ 62. According to the District, it did not originally recommend placing the Student into regular education settings for English and mathematics, and only did so because the Parents requested to do so and knew of the Student's tendency to refuse school when the Student did not get their way. ECF No. 35 at ¶ 27. The August 2019 IEP is the last agreed-upon IEP and serves as the pendent placement for the Student. ECF No. 30 at ¶ 63.

Early in the school year in August 2019, the Student was involved in a bullying incident involving a classmate and upon investigation, the classmate was found to have bullied the Student. *Id*. at ¶ 64. In September 2019, the IEP team met to see if the bullying incident required any IEP revisions or additional supports. The classmate's schedule was changed to avoid the Student and the classmate having a common class. The school-based members of the IEP team also continued to be concerned that the Student's mathematics class might be too challenging for the Student. *Id*. at ¶ 65.

The Student's attendance in September 2019 contained a handful of intermittent absences, although the absences became more consistent by the end of the month. *Id*. at ¶ 66. In early October 2019, the District implemented a school attendance improvement plan. *Id*. at ¶ 67. In October 2019, the Student's attendance deteriorated, with the Student absent on fifteen school days. *Id*. at ¶ 68. In mid-October 2019, the Parents sought a new FBA for the Student, and the District requested permission from the Parents to perform an FBA. *Id*. at ¶ 69. In late-October 2019, the Parents and Student engaged with the District about moving from the more advanced mathematics and English classes to less academically challenging classes. The Student also received an additional period for academic support. *Id*. at ¶ 70.

In early-November 2019, the Student's treating psychiatrist sent a letter to the District indicating that he was treating the Student for anxiety, depression, and autism spectrum disorder. *Id*. at ¶ 71.  The District maintains that this was the first notice it had throughout the Student's educational history that the Student had a diagnosis of autism spectrum disorder, and that the Parents requested that no mention of the autism, or autism support, be made to the Student. ECF No. 35 at ¶¶ 30-31.  In November 2019, the Student was absent 14 days. ECF No. 30 at ¶ 72.

In December 2019, the District issued an updated FBA, identifying the same concerns: school attendance, work completion, and task avoidance. *Id*. at ¶ 73.  In December 2019, the District convened an interagency meeting, including the Parents, District representatives, county children and youth services staff and representatives from other educational and community-based agencies. *Id*. at ¶ 74.  From November 2019 to December 20, 2019, the Student attended school on five days, three of which involved tardy arrival. *Id*. at ¶ 75.  As a result of the interagency meeting, the Student underwent a comprehensive psychological evaluation. *Id*. at ¶ 76.  On December 30, 2019, the Parents filed a Due Process Complaint. ECF No. 35 at ¶ 34.

In mid-January 2020, the psychologist issued an evaluation report. ECF No. 30 at ¶ 78.  In the report, the Parents reported that the Student was spending up to 20 hours per day in the bedroom. *Id*. at ¶ 79.  The report diagnosed the Student with autism spectrum disorder, generalized anxiety disorder, and depressive disorder. *Id*. at ¶ 80.  In mid-January 2020, the District drafted a PBSP and in late-January 2020, the Student's IEP team met to revise the Student's IEP.  The January 2020 IEP included the January 2020 PBSP and called for a staggered attendance schedule where, over time, the Student would attend progressively more classes. *Id*. at ¶¶ 81-82.  The parties did not agree on the January 2020 IEP. *Id*. at ¶ 83.

On March 13, 2020, the Commonwealth of Pennsylvania closed all schools due to the

COVID-19 pandemic, a closure which eventually kept schools closed for the remainder of the 2019-2020 school year. *Id*. at ¶ 84.  Over the period of January – March 13, 2020, the Student was largely absent from school. *Id*. at ¶ 85.  On March 31, 2020, the District issued a notice of recommended educational placement for the continuation of the Student's programming utilizing distance learning. *Id*. at ¶ 86.  Over the period of April 2020 through the end of the school year, the Student did not meaningfully engage in online learning or sessions with the social worker. *Id*. at ¶ 87.  During the 2019-2020 school year, the Student was absent from school 84 days. ECF No. 36 at ¶ 17.

### c.  Administrative Findings and Conclusions

The Parents filed a Due Process Complaint on December 30, 2019, arguing that the District's currently proposed program was inadequate to support the Student and denied the Student access to FAPE, that the District violated the IDEA and Section 504 of the Rehabilitation Act of 1973 and sought compensatory education commensurate with the period of deprivation of FAPE. ECF No. 22-9 at 168.  An initial session was held with the Hearing Officer on May 19, 2020, focusing on the statute of limitations. ECF No. 35 at ¶ 35.  On May 29, 2020, the Hearing Officer issued a Decision limiting Parents' claims to the period beginning on December 4, 2019. *Id*.  Additional hearing sessions occurred on June 2, 2020, June 9, 2020, and June 16, 2020.  On July 21, 2021, the Hearing Officer issued a Decision.

In his Decision, the Hearing Officer indicated that "[t]he crux of the parties' dispute is the point at which a school district's obligation to address a student's needs related to school-avoidance behaviors gives way to the therapeutic needs of the student and family, based on the student's mental health needs, where the student will not leave the house, or engage in distance learning or alternative learning." ECF No.  36-1 at 20.  The Hearing Officer concluded that

the record clearly supports a determination that the District throughout the [S]tudent's programming over the period January 2018 through the date of this record has provided a program reasonably calculated to provide the [S]tudent with FAPE. The District has engaged the [P]arents at all time, been responsive to their requests and the [S]tudent's needs, and done all that a school district should do in working with the complex issue of school avoidance.

*Id*. at 24. The Hearing Officer further stated

[t]here is one area, however, where the District has failed to provide FAPE to the [S]tudent, namely in failing to assess the [S]tudent's potential identification as a student with autism. Early on, and contemporaneously with the District's initial evaluation process in February 2018, the [S]tudent was placed in a residential program. Upon discharge, the program recommended that the [S]tudent be given an in-depth autism assessment, using a specifically-named instrument that is widely viewed as the most comprehensive and probing assessment for potential needs related to autism. The District had this document and its recommendation and simply failed to follow up. This is problematic in itself, to receive such a specific recommendation and not act on it (or at least discuss it and explore the reasons for the recommendation). But the District's February 2018 ER contained behavior rating scales from the [S]tudent's teachers that were rife with clinically-significant and at-risk ratings that indicate behaviors that are aligned with behaviors often seen in students with autism (for example, atypicality, social skills, and functional communication). Therefore, the District denied the [S]tudent FAPE in not moving forward with an assessment for the potential identification of the [S]tudent as a student with autism, a psychological diagnosis which followed in the months to come. Compensatory education will be awarded as a result.

ECF No. 36-1 at 24-25.

The Hearing Officer went on to explain that even though the Student was denied FAPE by the District failing to assess Plaintiff for autism, there were significant mitigating factors that impacted the amount of compensatory education awarded to the Student. The Hearing Officer found that

[t]he first of these is that the District did not overlook glaring signals that it was not assessing in all areas of potential disability. Indeed, multiple psychological and psychiatric professionals treated and formally evaluated the [S]tudent over the period in question, and none of them voices any indication regarding autism. Even the June 2018 private neuropsychological evaluation found no basis for diagnosing autism, in fact explicitly assessing for it and ruling it out.

ECF No. 61-1 at 25. Further, the Hearing Officer found it a mitigating factor that even if the

District tested for autism in February 2018, the Student "would have been entirely unavailable to engage in the assessment." *Id.* The Hearing Officer notes that the District is still at fault, "because it should have at least brought to the IEP team the notion of testing for autism, if not requesting permission to evaluate for it" and even if the Parents or Student would have not engaged in the evaluation process, "the District would have met its obligations." *Id.* Lastly, the Hearing Officer considered the fact that once the Student was formally diagnosed with autism and the IEP team was made aware of it, the Parents "were adamant that autism not be mentioned in the presence of the [S]tudent." *Id.* at 26. The Hearing Officer found this to be mitigating because the District "cannot be faulted for a situation where employing that data would be ill-received by the family." *Id.* The Hearing Officer therefore concluded that the District failed "from the earliest stages of planning for the [S]tudent's programming, to understand comprehensively the [S]tudent's potential needs" which required compensatory education, but the mitigating factors aforementioned would "severely limit the extent of that award." *Id.*

The Hearing Officer concluded that "the District largely met its FAPE obligations to the [S]tudent through its approach to the [S]tudent's programming and placements but denied the [S]tudent FAPE by not evaluating the [S]tudent for a potential identification of the [S]tudent as a student with autism." *Id.* at 26. By denying the Student FAPE, the Hearing Officer awarded the Student 100 hours of compensatory education, giving the Parents the sole discretion how the hours should be spent so long as those hours took the form of "appropriate developmental, remedial, or enriching instruction or services that further the goals of the [S]tudent's current or future IEPs, or identified educational needs." *Id.* at 28. As to the claim that the District discriminated against the Student, the Hearing Officer found that "the District did not act with deliberate indifference toward the [S]tudent. Even with the denial of FAPE . . . the record is clear that the District has always

sought to understand and to program effectively for the [S]tudent.  Plainly, there was never any

indifference toward the [S]tudent, deliberate or otherwise, on the part of the District." *Id*. at 27.

The Hearing Officer entered the following Order with regard to the Student's 2020-2021

school year:

> a.      Within 15 days of the date of this order, the District shall identify at least
> three educational programs with a therapeutic component for the student to attend
> in the 2020-2021 school year. The District shall communicate and coordinate as
> necessary to meet the application requirements of the identified programs,
> including the provision of education-related documents, such as District
> evaluations/re-evaluations, IEPs, and FBAs. The District shall communicate and
> coordinate as necessary with community-based agencies, or county children and
> youth services, or other providers, to obtain any mental health documentation to
> meet the admission requirements of the therapeutic aspects of the identified
> programs. The programs shall be made to understand that the District intends to
> enroll the student in the program for the 2020- 2021 school year.
>
> . . .
>
> d.      Within 30 days of the date of this order, or as soon as practicable as the
> admissions procedures of the programs allow, the student's parents shall be
> informed, in writing by exchanges between counsel for the parties, of the
> program(s) where the student has been accepted. Within 10 business days of being
> informed of the program(s) where the student has been accepted, the parents shall
> inform the District, in writing by exchanges between counsel for the parties, of the
> program they select for the student.
>
> e.      If, within 10 business days of the date of communication by the District to
> the parents of the potential program(s), the parents reject all programs, decline to
> select any program, or do not communicate their choice through counsel, the
> District shall select the program for the student.
>
> f.      The entire cost of the program, including transportation to and from the
> program and any therapeutic component, shall be borne by the District. The District
> shall bear the cost of the entire program because access to therapeutic services is
> necessary for the student's access to educational programming, both generally and
> at the program specifically.
>
> g.      Within 30 days of the student's admission to the selected program, the
> student's IEP team shall meet to finalize an IEP for educational programming at the
> program.
>
> h.      Additionally, once the student has been enrolled in a program, the District

shall fund a comprehensive independent autism evaluation to be performed in the educational environment at the program. Whether this independent evaluation is performed by a qualified employee of the program or an independent evaluator unaffiliated with the program is left to the discretion of the District. The record review, input, observations, assessments, testing, consultation, scope, details, findings, recommendations, and any other aspect of the independent autism evaluation shall be determined solely by the independent evaluator. Once the independent autism evaluator issues a report, the District shall convene an IEP team meeting to consider the report and any educational recommendations contained therein. The District shall arrange for the evaluator's participation in that IEP team meeting, in person or by phone as may be convenient for the evaluator, and shall bear the rate or fee for the evaluator's attendance at that meeting.

i.      Furthermore, the District shall be responsible for communicating with the program for daily attendance information for the student. Based on this data, the District shall maintain a 30-school-day rolling average of daily attendance at the program. If the 30-school-day rolling average of daily attendance drops below 66%, the District shall convene an IEP team meeting to consider whether a residential hospitalization program is appropriate for the student.

j.      To the extent that no partial program with a therapeutic employment accepts the student, the District shall undertake a similar process as outlined in paragraphs (a) - (h) above for a residential placement with a therapeutic component.

k.      Where parents and/or the student refuse(s) to provide necessary releases outlined in paragraph (c) above, for the mental health documentation requested by, and required for, the admissions processes of the programs' therapeutic component (whether a partial or residential program), the lack of providing such releases may be considered by the District to be a lack of meaningful participation in the IEP and related special education processes, amounting to a material dis-engagement from those processes. At that point, the District's FAPE obligation will be met by implementing the January 2020 IEP at the District and, to the extent that truancy or other provisions of the Pennsylvania School Code of 1949, as amended, apply to the student's lack of attendance, another tribunal with competent jurisdiction may consider, at its discretion and due to dis-engagement from the special education process, the student's status as a special education student to lie outside of its considerations as to any issue brought before said tribunal.

ECF No. 36-1 at 30-34.

On October 19, 2020, this appeal of the Hearing Officer's Decision was filed by the School District.

**III.    STANDARD OF REVIEW**

### a. IDEA

Under the IDEA, a court reviewing administrative action "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of the party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2).  District courts must give "due weight" to the factual findings of the Hearing Officer in IDEA cases. *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 758 (3d Cir. 1995).  In other words, the court must consider the Hearing Officer's findings of fact but is not required to accept such findings "unless [the court] can point to contrary nontestimonial extrinsic evidence on the record." *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003) (a hearing officer's factual findings should be treated as "prima facie correct").  "[A]lthough the district courts must consider the administrative findings of fact, they are free to accept or reject them. . . . But if the district court chooses to depart from the agency's ruling, it should provide some explanation for its departure." *Carlisle Area Sch. v. Scott P. By & Through Bess P.*, 62 F.3d 520, 527 (3d Cir. 1995).  Importantly, a reviewing court cannot "substitute its own notions of sound educational policy for those of local school authorities." *S.H.*, 336 F.3d at 270.

### IV.   DISCUSSION

### a. FAPE

The Hearing Officer found that the District provided the Student with a FAPE through its approach to the Student's programming and placements but, the District denied the Student a FAPE by not considering evaluating the Student for a potential identification of the Student as a student with autism.  The Hearing Officer therefore awarded the Student with 100 hours of compensatory education.  Both parties contest this decision, and each argument will be addressed

seriatim.

A school district can be liable for violations of the IDEA where the district (1) has not complied with the procedures set forth in the IDEA; and (2) has not fulfilled its obligation to provide the student with FAPE. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206–07, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982). "While a failure to satisfy either requirement may merit court-ordered relief, the appropriate relief depends on which requirement is not met. A [student] who alleges denial of a FAPE may seek compensatory relief in the form of appropriate educational services within the district (referred to as 'compensatory education') or tuition reimbursement for an appropriate placement in private school." *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66 (3d Cir. 2010) (alteration supplied). To the contrary, a student "alleging only that a school district has failed to comply with a procedural requirement of the IDEA, independent of any resulting deprivation of a FAPE, may only seek injunctive relief for prospective compliance." *Id.* (citations omitted).

"A procedural violation of the IDEA is not a per se denial of a FAPE; rather, a school district's failure to comply with the procedural requirements of the Act will constitute a denial of a FAPE only if such violation causes substantive harm to the child or . . . parents." *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 765 (6th Cir. 2001); see also *C.H.*, 606 F.3d at 66 (collecting cases). "Under the implementing regulations, substantive harm occurs only if the preponderance of the evidence indicates that the procedural inadequacies (i) [i]mpeded the child's right to a FAPE; (ii) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) caused a deprivation of the educational benefit." *C.H.*, 606 F.3d at 66 (quoting 34 C.F.R. § 300.513(a)(2)).

   i. *Autism Assessment*

The District argues that the Hearing Officer erred in awarding the Student 100 hours of compensatory education because he explicitly ruled that that District provided the Student with a FAPE. (ECF No. 34 at 3-6).  In so arguing, the District ignores the fact that the Hearing Officer explicitly found that the District both met its FAPE obligations with respect to the Student's programming and violated the Student's right to a FAPE with respect to failing to consider evaluating the Student for autism.  Therefore, this argument is rejected.

Next, the District argues that the Hearing Officer erred in ordering 100 hours of compensatory education for what essentially was a procedural violation of the IDEA.  It argues that the Hearing Officer erred when he believed that the February 2018 discharge paperwork from the hospitalization program should have prompted the District to perform an autism assessment because the District contacted the hospitalization program for recommendations and throughout the conversation, the program did not recommend an autism assessment and did not mention a possible diagnosis of autism, and the Parents never mentioned a concern with autism. ECF No. 34 at 7-9.  The Court agrees with the District that the Hearing Officer erred in finding that the District did not provide the Student with a FAPE because it failed to consider evaluating the Student for autism and awarded the Student 100 hours of compensatory education.

The timeframe to conduct evaluations and re-evaluations of a student for a potential disability are procedural requirements under the IDEA and Pennsylvania regulations. *JG v. Douglas Cnty. Sch. Dist.*, 552 F.3d 786, 798 (9th Cir. 2008).  Under the IDEA, an initial evaluation must be conducted within 60 days of receiving parental consent for the evaluation, or if the State establishes a timeframe within with the evaluation must be conducted, the State must determine if a child is a child with a disability and determine the educational needs of the child. 34 C.F.R. §300.301(c)(1)(i)-(ii); (c)(2)(i)-(ii).  Under the IDEA, the district must perform a reevaluation of

each child with a disability if it "determines that the educational or related services needs, including improved academic achievement and functional performance of the child warrant a reevaluation" or "[i]f the child's parent or teacher requests a reevaluation." 34 C.F.R. § 300.303(a)(1)-(2). Unless the parent and district agree otherwise, a reevaluation does not occur more than once a year. 34 C.F.R. § 300.303(b)(1)-(2).   Under Pennsylvania regulations, the initial evaluation shall be completed "no later than 60-calendar days after the agency received written parental consent for evaluation[.]" 22 Pa. Code § 14.123 (incorporating 34 C.F.R. §300.301).   Under Pennsylvania regulations, reevaluations shall be completed within 60-calendar days after a request or if the district determines reevaluation is warranted. 22 Pa. Code § 14.124 (incorporating 34 C.F.R. § 300.303).   The 60-day timeframe for evaluations does not apply if "[t]he parent of a child repeatedly fails or refuses to produce the child for evaluation[.]" 34 C.F.R. § 300.301(d)(1).

Here, the Hearing Officer relied on his sole finding that the District did not provide the Student with a FAPE because the discharge paperwork from the Student's hospitalization program in February 2018 recommended that the Student be assessed for autism, and the District overlooked the recommendation and did not perform the assessment.   While this is supported by the record, other more substantial findings severely undercut the Hearing Officer's finding that a failure to consider testing for autism violated the Student's right to a FAPE.   First, the Student was entirely unavailable to engage in any assessment, as the Student refused to participate in his initial evaluation in February 2018 during his seventh-grade year.   Moreover, during the March 2018 IEP process, neither the hospitalization program nor the Parents mentioned the need for any autism testing related to the recommendation contained in the discharge paperwork.   Moreover, the June 2018 Neuropsych Evaluation completed privately by the family contained a comprehensive assessment of the Student, including an assessment for autism spectrum rating scales, the results

of which assessed the Student as "entirely within the normal limits" for autism and explicitly ruled out a diagnosis of autism spectrum disorder and these results were shared with the District.  The Parents did not mention the need for any testing related to autism after the results of the June 2018 Neuropsych Evaluation.  During the Student's eighth grade year, in October 2018, during the Student's mental health component for the partial hospitalization program, a psychiatrist with the clinic performed a records review and diagnosed the Student with, *inter alia*, autism spectrum disorder.  These results were not shared with the District and the Parents did not inform the District of these results. The Parents did not mention this diagnosis during the November 2018 IEP process. During the Student's ninth grade year, in November 2019, the Student's treating psychiatrist sent a letter to the District indicating that he was treating the Student for anxiety, depression and autism spectrum disorder, which was the first notice that the District had of the Student's autism diagnosis. At this time, the Parents requested that no mention of the autism diagnosis or autism support be made to the Student.  In mid-January 2020, the District performed an Evaluation Report diagnosing the Student with autism spectrum disorder, generalized anxiety disorder and depressive disorder.

While the District potentially had notice of suspected autism in February 2018 through the hospitalization program's discharge paperwork, this suspicion was dispelled after the Student underwent the June 2018 Neuropsych Evaluation which explicitly ruled out autism spectrum disorder as a diagnosis and this was shared with the District.  At no point prior to November 2019 did the Parents mention the possibility of autism, despite having the recommendation from the February 2018 hospitalization program, and the autism diagnosis from the partial hospitalization program October 2018 records review.  After receiving this notice of the Student's autism diagnosis in November 2019, the District issued an evaluation report within the 60-day period

required in mid-January 2020. *See e.g.*, *JG*, 552 F.3d at 798.[3]  Therefore, the District did not violate

the procedural requirements of the IDEA, nor did any procedural violation rise to the level of

violating the Student's right to a FAPE or cause a deprivation of the educational benefit.[4]

Therefore, the Hearing Officer erred when he found that the District did not provide the Student

with a FAPE when it failed to consider assessing the Student for autism and assessed 100 hours in

compensatory education, and the District's motion for summary judgment will be granted in this

respect.

　　Even if it is found that the District delayed in assessing the Student for autism, this violation

is procedural and there is no evidence that the violation caused substantive harm.  The record is

undisputed that even if the Student received an autism diagnosis that the Student's educational

programming would not have changed, because programming was based upon the Student's

---

[3]　　In *JG*, a set of twins were evaluated at a free community center and suspected of having autism spectrum disorder.  The community center referred the parent to enroll the twins in the defendant-school district program for developmentally-delayed children. *JG*, 552 F.3d at 789.  The parent enrolled the twins in May 2003 and began evaluations for the twins shortly thereafter, the district did not complete an autism evaluation until September 2003. *Id*.  The parent independently enrolled the twins in the community center's program which completed its own testing, including for autism. *Id*.  The community center did not inform the district of its suspicions that the twins had autism spectrum disorder until July 28, 2003. *Id*.  At the August 2003 IEP meeting with the district, the parent attended the meeting with a binder labeled "Autism" and the school psychologist asked if the parent had concerns of the twins being autistic, to which the parent replied that the community center staff thought that the twins could be autistic but she was not sure. *Id*.  A month after, the district began evaluating the twins for autism, diagnosed the twins as mildly-moderately autistic in October 2003 and implemented an IEP in November 2003. The court found that the earliest the district had notice or knowledge of any suspected autism was July 28, 2003, which was about two weeks before the scheduled assessments and therefore the district did not violate the IDEA for its delay in assessing the twins for autism. *JG*, 552 F.3d at 799.

[4]　　The Hearing Officer explicitly found that "[t]he District did not overlook glaring signals that it was not assessing in all areas of potential disability.  Indeed, multiple psychologists and psychiatric professionals treated and formally evaluated the student over the period in question, and none of them voiced any indication regarding autism.  Even the June 2018 private neuropsychological evaluation found no basis for diagnosing autism, in fact explicitly assessing for it and ruling it out." ECF No. 22 at p. 29; Decision p. 24.

behaviors and not potential diagnoses.[5]  Therefore, the failure to consider testing for autism did not result in a loss of an educational opportunity for the Student because the Student's educational programming would have stayed the same regardless of any potential autism diagnosis.[6] *C.H.*, 606 F.3d at 67 (quoting 34 C.F.R. § 300.513(a)(2)).

---

[5]     The Student's case manager for the 2018-2019 year testified:

> Q.     Would a diagnoses or changing diagnoses or process or a decline be relevant to your program in the class?

> A.     Changes in diagnosis, no.  But anything else that's relevant behavior-wise that would affect him in the classroom, yes.

ECF No. 22-1 at p. 11; Tr. 476-77.   Likewise, the Student's special education teacher testified:

> Q.     And in your experience with [the Student], as [the Student's] Special Education teacher, it never occurred to you that [the Student] might have needs related to autism?

> A.     I mean, it may have occurred to me but that doesn't really change how I would have done anything.  I mean, [the Student] exhibited behaviors that sometimes were like autism and sometimes weren't so I was more focused on the behaviors themselves than the label.

ECF No. 22-1 at 28-29; Tr. 545-546.  Lastly, the District's social worker testified:

> Q.     What impact, if any, do you have(sic) believe the autism diagnosis has for [Student's] educational program?

> A.     Specifically, the diagnosis doesn't impact the educational portion of things as we, you know – the interventions and goals what were implemented were designed to address the areas that [the Student] was presenting with, the areas of need that [the Student] was presenting with.

ECF No. 22-1 at 66; Tr. 695-96.

[6]     Further, compensatory education is not available for procedural violations and therefore even if the District procedurally violated the IDEA, the compensatory education award of 100 hours was also in error.

Accordingly, the District's motion for summary judgment on this point is granted and the Defendants' motion for summary judgment on this point is denied.

## ii. *Educational Programming*

Next, the Defendants argue they are entitled to summary judgment because the Hearing Officer erred in his determination that the District provided the Student with a FAPE for the Student's educational programming. They argue that the District had an obligation to provide a positive behavioral support plan at the time of the initial IEP and did not, and it failed to collect any data on the Student's most significant interfering behavior, i.e., school avoidance and anxiety. ECF No. 38 at 8.  The Defendants argue that because the District crafted a program in reliance on an insufficient FBA and developed an inappropriate PBSP, the District violated the Student's right to a FAPE. *Id.*  Defendants further argue that when the Student was not responsive to the IEP supports, the District "had an obligation to observe, assess, and program for his needs in the setting in which [the Student] was exhibiting these behaviors – the home." *Id*. at 38 (citing 22 Pa. Code § 14.133(b)).

Defendants' argument that the District's failure to conduct a sufficient FBA and inappropriate PBSP violated the Student's right to a FAPE is rejected because "the IDEA and its implementing regulations do not require that a school use a functional behavioral assessment when initially testing students for suspected disabilities." *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 251 (3d Cir. 2012).  The IDEA only requires an FBA "when a disabled student, who is already being educated pursuant to an IEP, continues to exhibit behavioral problems.  This neither precludes nor requires use of a functional behavioral assessment in initial disability evaluations.  As with all evaluations, the component testing mechanisms must be determined on a case-by-case basis depending on the suspected disability and the student's needs." *Id*. at 251 n.7 (citing 20 U.S.C. §

1414(b)(2)(A)-(C); 34 C.F.R. § 300.304(b)(1)-(3)).  Therefore, the failure of the District to use a functional behavioral assessment during the initial evaluation did not deny the Student a FAPE and Defendants' motion is denied in this respect.

Defendants' next argument that the District was compelled to conduct testing in the Student's home, and that its failure to do so violated the Student's right to a FAPE, is likewise rejected.  First, Defendants' citation to 22 Pa. Code § 14.133(b) offers no support for its assertion that requires a school agency perform assessments in the home, and Defendants have failed to offer any citation to other legal authority requiring a school district to do so.  In fact, the District attempted to conduct the initial evaluation of Student at home, and the Student refused to participate and barricaded themselves in their bedroom.  Moreover, the District made referrals and worked with several outside agencies that reported to the District regarding the Student's at-home behaviors, including for the Student's truancy issues.[7] Therefore, the failure of the District to continually attempt to evaluate the Student at home did not prevent the Student from a FAPE and Defendants' motion is denied in this respect.

Lastly, Defendants' argument that the Student's educational programming denied the Student of a FAPE is also rejected.  Defendants do not provide a specific argument regarding how the educational programming failed to provide the Student with a FAPE.  The IDEA "cannot and does not promise any particular educational outcome[,]" and a school agency must implement an "IEP that is reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances" to provide a FAPE. *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 197 L. Ed. 2d 335 (2017).  As fully explained by the Hearing Officer, the

---

[7]     These agencies included Children Youth Services, Blue Prints, the Youth Advocacy Program and the District convened an Interagency Meeting with various agencies and the Parents to coordinate additional supports. Tr. 862-64, 879, 932-34; S-32; S-95; S-107.

District provided the Student with a FAPE and meticulously outlined the process that the parties

went through to develop IEPs for the Student. *See* Decision pp. 4-19.  Therefore, the Hearing

Officer did not err when he found that the District met its FAPE obligations with respect to the

Student's programming and accordingly, Defendants' motion is denied in this respect.

### b. Student's Placement in a Therapeutic Program with the Potential for Later Placement in a Residential Facility and Independent Autism Assessment

As part of the Hearing Officer's Order, he ordered that

(1) The District identify three "educational programs with a therapeutic component" for the Student to attend during the 2020-2021 school year, inform the Parents where the Student has been accepted and then the Parents shall decide where the Student will attend. If the Parents do not respond or reject the placements, the District shall select the program;

(2) The District pay for the entire cost of the therapeutic program;

(3) If the Student's attendance drops below sixty-six percent for a 30 day average, the IEP shall consider whether a "residential hospitalization program" is appropriate; and

(4) If no "partial program with a therapeutic employment" accepts the Student, the District shall select a "residential placement with a therapeutic component" similar to the process employed for the educational program with a therapeutic component.

Decision, pp. 29-32.  The Hearing Officer further ordered that the Student undergo an independent

autism evaluation. Decision, pp. 31-32.

The District argues that the Hearing Officer exceeded the issues in the hearing and his

authority by *sua sponte* addressing placement and ordering an independent autism evaluation

without the benefit of a full factual record.  The Defendants do not take issue with the Hearing

Officer's order.  It is undisputed that the Hearing Officer ordered the placement of the Student and

an independent autism assessment without request by either party, or without evidence supporting

such a placement.  However, the Court need not address whether the Hearing Officer exceeded his

authority in entering this order, because a court "may provide a substantive remedy only when it

determines that a school has denied a FAPE. . . . Without such a finding," substantive relief is

"unavailable", and the court may "do nothing more than order a school district to comply with the

[IDEA's] various procedural requirements." *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 137 S. Ct.

743, 754, n.6-7 197 L. Ed. 2d 46 (2017).  Accordingly, because the District has not denied the

Student of a FAPE, the Court cannot order substantive relief requiring placement of the Student

and conducting an independent autism evaluation.[8]   Accordingly, the District's motion for

summary judgment is granted in this respect, and the Defendants' motion for summary judgment

is denied in this respect.

### c.  Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794

Defendants assert a claim for a violation of Section 504 of the Rehabilitation Act of 1973

("RA") and argue in support of their summary judgment motion that the Hearing Officer erred

when he determined that the District did not act with deliberate indifference to the Student's needs

and found that the District did not violate the RA.

To prevail on an RA claim, it must be shown that a student "(1) has a disability; (2) was

otherwise qualified to participate in a school program; and (3) was denied the benefits of the

program or was otherwise subject to discrimination because of her disability." *Chambers ex rel.*

*Chambers v. Sch. Dist. Of Philadelphia Bd Of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009).  The third

element can be satisfied by a showing of deliberate indifference on behalf of the school agency

and the student "must present evidence that shows both: (1) knowledge that a federally protected

right is substantially likely to be violated . . ., and (2) failure to act despite that knowledge." *D.E.*

---

[8]    The parties indicate that they do not disagree with the Hearing Officer ordering the Student's placement in a day program with a therapeutic component.  While they are free to discuss this as part of the Student's continuing educational programming, the Court does not have the authority to order this placement.

*v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 269 (3d Cir. 2014) (internal quotation marks and citations omitted).  The deliberate indifference standard "does not require a showing of personal ill will or animosity toward the disabled person[;] . . . [i]t does, however, require a 'deliberate choice, rather than negligence or bureaucratic inaction." *D.E.*, 765 F.3d at 269 (internal quotation marks and citations omitted).

Here, there is no evidence that the District knew the Student's federally protected rights were substantially likely to be violated and made a deliberate choice to not act despite that knowledge.  Defendants argue that the District was aware that the Student has missed excessive amounts of school, had community based mental health treatment and diagnoses of anxiety and depression, despite the implementation of the IEP, the Student continued to fail all academic classes, and community providers had diagnosed or indicated concerns related to autism spectrum disorder, but the District took no action to better evaluate or support the Student. ECF No. 38 at 10.

Despite Defendants' contentions, there is an abundance of evidence to the contrary that the District took action to address the Student's issues.  To address the Student's excessive absences, the District made referrals and worked with several outside agencies that reported to the District regarding the Student's truancy issues, including Children Youth Services, Blue Prints, the Youth Advocacy Program and the District convened an Interagency Meeting with various agencies and the Parents to coordinate additional supports related to the Student's truancy. Tr. 862-64, 879, 932-34; S-32; S-95; S 107.  Moreover, the District referred the Student, and the Student did attend both a mental-health short-term residential hospitalization program and a partial hospitalization program to receive mental health services and educational services to address the Student's mental health and truancy issues.  Further, the District implemented numerous school attendance

improvement plans, and almost every IEP included goals for school attendance.  The steps that the District took to address the Student's attendance issues do not rise to the level of deliberate indifference, and rather show that the District employed the appropriate mechanisms to address the Student's attendance issues.

Likewise, the District considered the Student's diagnosis of anxiety and depression at each stage of the evaluation and IEP process and implemented IEPs, which included provisions for the Student to attend a mental-health short-term residential hospitalization program and a partial hospitalization program to receive mental health services and educational services to address the Student's diagnoses.  Moreover, the IEPs provided that the Student engage with the District's social worker and develop coping skills related to the diagnoses and the District's actions in creating support and services for the Student addressed the Student's diagnoses and does not rise to the level of deliberate indifference, and rather show that the District employed the appropriate mechanisms to address the Student's anxiety and depression diagnoses.

As to Defendants' claim that the IEPs were not successful in addressing the Student's issues, Defendants cite to no law to support a finding that an unsuccessful IEP constitutes deliberate indifference under the RA.  The IDEA does not promise any particular educational outcome and only requires that an IEP is "reasonably calculated to enable a child to make progress appropriate in the light of the child's circumstances[.]" *Endrew F. ex rel. Joseph F.*, 137 S. Ct. 988.  The Student was objectively showing progress during their placement in the short-term residential hospitalization program and the partial hospitalization program, yet the Parents refused to continue the Student's placement in those programs against District recommendations.  Nothing in the record supports a finding that the Student's IEPs were anything but reasonably calculated to enable the Student to make progress and were appropriate in the light of the Student's

circumstances, and any perceived failure of the IEPs does not constitute deliberate indifference.

Lastly as to Defendants' argument that the District took no efforts to diagnose or indicate concerns related to autism spectrum disorder, as previously found, while the District potentially had notice of suspected autism in February 2018 through discharge paperwork of the hospitalization program, this suspicion was dispelled after the Student underwent the June 2018 Neuropsych Evaluation which was shared with the District and explicitly ruled out autism spectrum disorder and at no point prior to November 2019 did the Parents mention the possibility of autism, despite having the recommendation from the February 2018 hospitalization program and the autism diagnosis from the partial hospitalization program October 2018 records review. After receiving the autism diagnosis in November 2019, the District issued an evaluation report within the 60-day period required in mid-January 2020.  There is no evidence that the District was deliberately indifferent in failing to diagnose the Student with autism spectrum disorder before mid-January 2020.  *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 265 (3d Cir. 2013) (no liability under the RA for a school misdiagnosing a student where there was no evidence that the school had knowledge that it was a wrong diagnosis and "evidence that the [district's] evaluation processes were defective [does not] bear on [this] analysis.").

Accordingly, the District did not violate the RA and Defendants' motion for summary judgment is denied in this respect.

### d.  Attorneys' Fees and Cost

Lastly, Defendants argue they are entitled to an award of reasonable attorneys' fees under the fee shifting provision of the IDEA because they are a "prevailing party" by virtue of the Hearing Officer awarding 100 hours of compensatory education to the Student. 20 U.S.C. § 1415(i)(3)(B).  Because the Court determined that the District provided the Student with a FAPE,

Defendants' motion for attorneys' fees and costs is summarily denied.

### V.      CONCLUSION

Based on the foregoing, the District's motion for summary judgment is granted in its entirety and the Defendants' motion for summary judgment is denied in its entirety.   An appropriate Order and Judgment follow.


Dated: June 30, 2022.                                By the Court,
                                                     s/ Cynthia Reed Eddy_____
                                                     Cynthia Reed Eddy
                                                     Chief United States Magistrate Judge


cc:     All counsel of record
        *via electronic filing*